# United States Court of Appeals
## For the First Circuit

No. 18-1621

JOHN R. BARTOLOMEO,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Howard, Chief Judge, and
Lynch and Lipez, Circuit Judges.

Bernard Grossberg for petitioner-appellant.

Jennifer Hay Zacks, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
respondent-appellee.

May 29, 2020

**LIPEZ**, **Circuit Judge**.  In May 1998, a district court sentenced petitioner John Bartolomeo to thirty-five years' imprisonment for drug dealing pursuant to a plea agreement recommending that specific prison term.  The above-Guidelines sentence was intended to reflect Bartolomeo's role in two uncharged violent crimes: his severe beating of one member of a rival motorcycle club and his intentional, fatal striking of a second member with his car.  Nearly twenty years later, in January 2018, Bartolomeo filed a successive federal habeas petition pursuant to 28 U.S.C. § 2255 based on intervening Supreme Court caselaw holding the residual clause of the Armed Career Criminal Act ("ACCA") unconstitutional.  See Johnson v. United States (Johnson II), 135 S. Ct. 2551 (2015); United States v. Booker, 543 U.S. 220 (2005).  Claiming that his status as a "career offender" under the Sentencing Guidelines impacted his sentence and that the new precedent on the ACCA also invalidated that Guidelines classification, Bartolomeo requested resentencing to a lesser term of imprisonment.  The district court ("the habeas court") denied Bartolomeo's habeas petition and granted a certificate of appealability.  See 28 U.S.C. § 2253(c)(2).  Because we agree with the habeas court that the sentencing judge did not rely on Bartolomeo's career-offender designation in setting his term of imprisonment, we affirm the denial of Bartolomeo's petition.

We draw the following factual summary primarily from Bartolomeo's plea agreement, the transcript of his combined plea and sentencing proceeding, and uncontested portions of his Presentence Investigation Report ("PSR").

## A. Indictment and PSR

In a seventeen-count superseding indictment filed in October 1996, Bartolomeo, a member of the Hells Angels motorcycle club, was charged with conspiring to distribute cocaine and methamphetamine, and with possessing those drugs with the intent to distribute them. Based on the quantity of drugs for which he was deemed responsible, Bartolomeo's PSR calculated his base offense level ("BOL") as 32. However, the PSR also stated that his prior convictions qualified Bartolomeo as a career offender under the Sentencing Guidelines, see U.S.S.G. § 4B1.1,[1] which

---

[1] The applicable version of the Guidelines provided that "[a] defendant is a career offender if

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1 (1997). A crime of violence under the Guidelines was defined as a federal or state law offense specifically named, including burglary of a dwelling and arson, as well as any crime that "otherwise involves conduct that presents a serious potential

increased his offense level to 37 and produced a Criminal History Category ("CHC") of VI.[2]

The PSR contained an undisputed description of Bartolomeo's involvement in two violent crimes against members of a rival motorcycle club. The first was described, in pertinent part, as follows:

> [O]n July 1, 1995, Bartolomeo and others chased Girard Giorgio on Route 3. Giorgio, a member of the Devil's Disciples Motorcycle Club, was riding his motorcycle with another member of the Devil's Disciples at the time. When Bartolomeo and others caught up with Giorgio, they beat him badly and stripped him of his Devil's Disciples "colors."

About two weeks after this incident, Bartolomeo bragged to an undercover officer posing as a drug customer that "two or three weeks" earlier he had "kicked in the teeth" of a Devil's Disciples member and "boasted that this individual was still in critical condition and that [Bartolomeo] would have stabbed this individual in the heart if there had been fewer people around."

---

risk of physical injury to another." Id. § 4B1.2(a)(2) (1997). The portion of the definition beginning with "otherwise" is known as "the residual clause."

[2] As the habeas court observed, "[t]he predicate convictions for the career offender classification are not entirely clear." Bartolomeo v. United States, 316 F. Supp. 3d 539, 542 (D. Mass. 2018). However, the parties have proceeded on the assumption that the triggering predicates are Bartolomeo's 1993 conviction for assault and battery and his 1995 conviction for assault and battery on a police officer. See id.

- 4 -

The second episode occurred about two weeks after the conversation with the undercover officer recounted above:

> On Saturday, July 29, 1995, Bartolomeo accelerated his automobile at the intersection of Route 18 and Park Avenue in Weymouth and struck William Michaels. Michaels, a member of the Devil's Disciples, was riding his motorcycle at the time. Michaels later died as a result of the collision.

B. **Plea Agreement**

In May 1998, Bartolomeo entered into a plea agreement with federal and state prosecutors in which he agreed to plead guilty to twelve drug distribution counts and two criminal forfeiture counts. The agreement stated that Bartolomeo's BOL was 32 -- i.e., the level calculated by the PSR based on the drug quantity for which he was held responsible. The agreement noted that Bartolomeo was subject to a three-level upward adjustment for his role in the offense and an offsetting three-level decrease in his BOL for acceptance of responsibility, thus producing a total offense level ("TOL") of 32. The agreement did not reference the PSR's career-offender designation, and it stated that the parties had not reached an agreement on the appropriate CHC.

Under the heading "Sentence Recommendation," the agreement reported that "[t]he parties will make a joint recommendation to the Court at the Defendant's sentencing hearing that the Court depart upwards from the guideline range otherwise applicable to the Defendant and impose a sentence of 35 years'

imprisonment."   The agreement expressly linked this upward departure to Bartolomeo's involvement in the two violent incidents described above.   Under the heading "Upward Departure," the agreement provided:

> As set forth in the joint motion for an upward departure attached to this agreement, the parties agree that the undisputed facts contained in the Defendant's Presentence Report concerning the Defendant's participation in the assault and battery of Girard Giorgio on July 1, 1995 and the Defendant's responsibility for the death of William Michaels on July 29, 1995 warrant an upward departure pursuant to § 4A1.3(e) of the Sentencing Guidelines.[3]

Pursuant to the agreement, if the sentencing court accepted the recommended thirty-five-year term, the United States Attorney would not charge Bartolomeo with any federal crime based on the two July 1995 incidents, and the pertinent Massachusetts district attorney would not charge him with violating any state

_____

[3] The applicable version of Guidelines section 4A1.3, which is designated as a "Policy Statement," provided that an upward departure may be warranted "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct." The section explains that "[s]uch information may include . . . (e) prior similar adult criminal conduct not resulting in a criminal conviction." U.S.S.G. § 4A1.3 (1997). The referenced departure motion -- submitted jointly by the government and Bartolomeo -- stated that Bartolomeo acknowledged his participation in the two violent incidents and that this "uncharged conduct . . . constitutes a basis for an upward departure" under the Guidelines. The motion further noted the parties' agreement that the undisputed facts warranted an upward departure beyond the range provided by CHC VI, the highest category.

law based on the motor vehicle striking incident.[4]  As part of the agreement, Bartolomeo waived his right to appeal his conviction and sentence, and waived collateral challenges under 28 U.S.C. § 2255 except for those based on "any future decision, ruling, change in law or change in the Sentencing Guidelines [that] may result in a reduction in the total time of the Defendant's incarceration."

## C.  Change of Plea and Sentencing

The district court accepted Bartolomeo's guilty plea and sentenced him in a combined proceeding held in May 1998.  We describe each portion of that proceeding in turn.

### 1.  Change of Plea

Early in its change-of-plea colloquy with Bartolomeo, the sentencing court reviewed the charges against him and confirmed that Bartolomeo understood them.  The court emphasized the jury-trial rights that Bartolomeo would be giving up by pleading guilty, and it noted the statutory minimum and maximum sentences applicable to the crimes charged.  The court asked Bartolomeo if he understood the plea agreement, and Bartolomeo answered affirmatively.  The court also generally described the Sentencing Guidelines, confirmed that Bartolomeo had discussed them with his attorney,

---

[4] The parties do not explain why the state prosecutor's agreement applied only to the later incident, but the discrepancy is not material to our analysis.

and noted that "unless there's something very special, very evil, really, about you, and they say there is in this case, I can't go above the top of that range and then I can't go below the bottom of the range."

The court then questioned the government's attorney on the Guidelines calculation, as follows:

> **COURT**: And I'm going to ask [Assistant United States Attorney ("AUSA")] Hobart, unless it's done here in the plea agreement, and it does not appear to be done, despite the joint recommendation for an upward departure, before we go any further he needs to know where the sentencing guidelines put him. Would you calculate them in the aggregate for me very briefly, bottom line, giving him credit for acceptance of responsibility.
> **AUSA**: Yes, your Honor. Under the plea agreement I think, I believe the total offense level would be 32, going up three points for role in the offense and down three points for acceptance of responsibility. Without taking into account any career offender provisions, the maximum amount, maximum range would be 262 months in a criminal history category of VI.
> **COURT**: And your position is that he's at a criminal history category VI?
> **AUSA**: I believe that the probation department found that to be so, your Honor.
> **COURT**: Okay. So he's . . . at level 32, correct?
> **AUSA**: Correct, your Honor.
> **COURT**: Criminal history category VI?[5]
> **AUSA**: Correct.
> **COURT**: So that gives a minimum --
> **AUSA**: That's just upon the drug quantity. And then if the probation department's

---

[5] Contrary to this agreement on CHC VI, that category applied only to the career-offender classification. In the sentencing portion of the proceeding, the district court noted that Bartolomeo's CHC was III without that enhancement. See infra.

- 8 -

determination were accepted, he was found to be a career offender, his base offense level would be set at 37, three levels reduction for acceptance of responsibility for 34, which would produce a range of 262 to 327.

**COURT**: All right, but . . . [d]on't you have to give notice that you're prosecuting him as a career offender?  You don't?

**AUSA**: No, you don't.

**COURT**: All right.  So now if he pleads guilty to these, what is your position as to whether he's a career offender?

**AUSA**: Neither myself nor Mr. Natola [defense counsel] filed any objections to that portion of the presentence report.

**COURT**: Which calculates that he is.

**AUSA**: Yes.

**COURT**: All right.  So really we're talking 262 to 327 months under the sentencing guidelines.

**AUSA**: Right.  And not to speak for Mr. Natola, but in light of the agreement, I filed a joint motion for upward departure, there wasn't any reason for Mr. Natola to object to that determination.

**COURT**: And I fully understand that. It's just so important to me that Mr. Bartolomeo understands each step in this procedure.

So, 262 months under the sentencing guidelines, if I don't do anything, it's 21 years and some months, 327 months, the range is 21 years and some months to 25 years and some months, based upon what I'm told.[6]

Is that how the sentencing guidelines have been explained to you?

**BARTOLOMEO**: Yes, sir.

The court then focused specifically on the joint motion for upward departure, observing that the court could depart upward even without a motion but advising Bartolomeo that "when they both tell me that I ought to depart upward, I have to tell you it's

---

[6] In fact, 262 months is nearly twenty-two years, and 327 months is about twenty-seven years.

much more likely that I will." Asked if he understood that, "as a functional matter now, . . . you're really looking at 35 years in prison if you plead guilty," Bartolomeo responded, "Yes, I do, sir."

The court then pointed out that the upward departure was based on the "incident involving a William Michaels," obtained assurance from the government that both federal and state authorities had agreed not to prosecute Bartolomeo for that conduct in exchange for his guilty plea on the drug charges, and elicited Bartolomeo's admission that the depiction of the drug offenses presented in the PSR was accurate. The court then accepted Bartolomeo's guilty plea to the fourteen drug and criminal forfeiture counts, finding that the plea was "knowingly, intelligently and voluntarily" made.

### 2. The Sentencing

The sentencing portion of the proceeding began with the court's description of its intended approach:

> **COURT**: I think in framing your arguments I should say that, one, though I'm going to do the sentencing guideline calculations, I am disposed to depart upward on the grounds of the joint motion; and two, implicit in my acceptance of the plea after a pre-plea presentence report, I am disposed to accept the joint recommendation and sentence no more nor less severely.
> Now, with that in mind, I'm going to do the calculations required by the sentencing guidelines. If anyone would differ with them,

- 10 -

please call that to my attention and I will, I will entertain it right at that time.

The base offense level in this case is 32. I am adjusting upward by three levels for Mr. Bartolomeo's role in the offense finding that he is a manager or supervisor of this, these drug transactions. I am going to adjust downward three levels for his acceptance of responsibility, . . . taking us back to a total offense level of 32. . . . I do find that he is a career offender and that applying the career offender guidelines his corresponding offense level is 37. As he is a career offender, his criminal history category, which otherwise would be III, is calculated at VI, which gives us a sentencing range of not less than --

**AUSA**: He would also receive a three[-]level decrease, your Honor, for acceptance. His total offense level would be 34, not 37.

**COURT**: Is that right? The probation officer? That's where you --

**PROBATION**: Yes, your Honor.

**COURT**: -- calculate it in?

**PROBATION**: Yes.

**COURT**: . . .

That gives us a sentencing range as we discussed with Mr. Bartolomeo of not less than 262 nor more than 327 months, and tentatively that's how I calculate the guidelines.

You accept that, Mr. Hobart?

**AUSA**: Yes, your Honor.

**COURT**: You accept that, Mr. Natola?

**NATOLA**: Yes, I do, your Honor.

The court then heard from both counsel, beginning with the government. AUSA Hobart explained that "[t]he factual basis for the government's upward departure involves the death of William Michaels on July 29, 1995," and he went on to detail the circumstances of that incident, including Bartolomeo's subsequent flight to New York and his time spent in hiding there. Defense

- 11 -

counsel added only a brief comment, expressing agreement with the Guidelines calculation "and also with the factual basis for the motion for upward departure."

Before allowing Bartolomeo to speak, the court noted that "this William Michaels thing . . . would be the basis of my upward departing," and it therefore asked Bartolomeo if it were "true[] that you intentionally struck William Michaels on July 29, 1995, using your vehicle while he was riding a motorcycle?" Bartolomeo answered, "Yes, it is." The court reiterated the state of mind question, asking, "And you did that intentionally, ran him down intentionally?" Bartolomeo responded, "Yes, I did." Accepting the court's invitation to speak at that point, Bartolomeo spoke at some length about being "a man with fierce loyalty," learned from his parents and siblings, "and my brothers that are here from the Hells Angels." Among his other statements, Bartolomeo asserted that, "if you told me today that I could go home to my family if I would denounce being a member of the Hells Angels, I wouldn't do it. I'm a Hells Angel, in my heart and my bones." Bartolomeo indicated disapproval for criminal defendants who "take the easy way out" and cooperate with the government in exchange for a reduced sentence, and, accusing the undercover law enforcement agent of "betray[ing]" him, asserted that he "could never do that to somebody."

Immediately following Bartolomeo's remarks, the court sentenced him to thirty-five years' imprisonment on one count, "and either 35 years or the maximum sentence on each of the remaining counts," with all sentences to run concurrently. The court directly addressed Bartolomeo to explain the sentence:

> You haven't got the first idea about loyalty. Don't sully the names of those who have served the nation by your conduct, your drug dealing, your spreading of poison throughout the community. You disgrace those who know what the meaning of loyalty is. Loyalty has to do with things greater than yourself. You have done nothing but serve your own needs as you perceived them at the time. You have shown no value for human life or health or care for anyone. You say that's the road you've chosen. So be it.

In its Statement of Reasons issued with the judgment, the sentencing court listed the TOL as 32, the level applicable without career-offender status, but it listed the greater imprisonment range (262 to 327 months) and CHC (VI) that applied to the career-offender guideline.

## II.

Insisting that his thirty-five-year sentence, and his willingness to accept it, depended on his status as a career offender, Bartolomeo asserts in his habeas petition that he is entitled to resentencing to a lesser term of imprisonment because, under current law, he was wrongly classified as a career offender. Bartolomeo argues that he may bring this claim two decades after

his sentencing because a series of recent Supreme Court cases effected a "change in law" that "may result in a reduction in the total time of [his] incarceration" -- precisely the circumstance excepted from the appellate waiver contained in his plea agreement. See supra Section I.B (quoting the plea agreement). He further maintains that he satisfies the requirements for habeas relief under 28 U.S.C. § 2255.

We begin our analysis by reviewing the Supreme Court sentencing precedent on which Bartolomeo relies and the components of a challenge under § 2255. We then briefly recount the habeas court's reasoning in rejecting Bartolomeo's habeas petition before turning to our own assessment of his claim.

## A. Predicate Crimes post-Johnson II[7]

Both the ACCA, 18 U.S.C. § 924(e), and the career offender provision of the Sentencing Guidelines, U.S.S.G. § 4B1, provide for enhanced punishment for certain repeat offenders. Under the ACCA, "a defendant convicted of being a felon in possession of a firearm faces more severe punishment if he has three or more previous convictions for a 'violent felony.'" Johnson II, 135 S. Ct. at 2555. Before the Supreme Court's decision in Johnson II, the statute had defined a "violent felony"

---

[7] Johnson I addressed the "force" clause of the ACCA, which is not implicated in this case. See Johnson v. United States, 559 U.S. 133 (2010).

- 14 -

to include any felony, in addition to certain specified violent crimes, that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B) (2012). The Court struck down this portion of the definition -- the so-called residual clause -- as unconstitutionally vague, 135 S. Ct. at 2557, and it subsequently held that Johnson II's holding applied retroactively to collateral challenges, see Welch v. United States, 136 S. Ct. 1257, 1268 (2016).

The Supreme Court later considered whether "the identically worded residual clause" in the career-offender provision of the Guidelines -- defining a "crime of violence"[8] -- suffers from the same constitutional defect. See Beckles v. United States, 137 S. Ct. 886, 890 (2017). The Court held that it does not -- at least since the Court ruled that the Guidelines must be treated as advisory rather than mandatory. Id. at 894-95; see Booker, 543 U.S. at 245 (deeming the Guidelines advisory). In a concurrence, Justice Sotomayor noted that the Court had left open whether defendants who were sentenced under the pre-Booker

---

[8] We have observed that the equivalence in language between the ACCA definition of a "violent felony" and the Guidelines definition of a "crime of violence" "makes decisions 'interpreting one phrase frequently . . . persuasive in interpreting the other.'" United States v. Ramírez, 708 F.3d 295, 301 n.4 (1st Cir. 2013) (quoting United States v. Winter, 22 F.3d 15, 18 n.3 (1st Cir. 1994)).

mandatory Guidelines regime, like Bartolomeo, "may mount vagueness attacks on their sentences."   Beckles, 137 S. Ct. at 903 n.4 (Sotomayor, J., concurring in the judgment).

The argument that Bartolomeo presents in his habeas petition -- that he was improperly classified as a career offender -- is thus anchored in Johnson II, Welch and Beckles,[9] but the Supreme Court has not yet answered the specific question on which his petition turns: whether the reasoning of Johnson II applies to career-offender determinations made prior to Booker, when the Guidelines were mandatory.  Justice Sotomayor, joined by Justice Ginsburg, dissented from the denial of certiorari in a 2018 case that could have resolved the circuit split on that question.  See Brown v. United States, 139 S. Ct. 14, 15-16 (2018) (Sotomayor, J.) (dissenting from denial of certiorari and describing the differing circuit decisions)[10]; id. at 16 (stating that "this case

---

[9] The parties in this case agree that, if the residual clause in the career-offender provision was unconstitutionally vague at the time Bartolomeo was sentenced, he could no longer be classified as a career offender because the two predicate convictions presumed to underlie that classification do not otherwise qualify as "crime[s] of violence."

[10] Our court also has not decided whether a habeas petitioner may rely on the reasoning of Johnson II to challenge the identical language in the mandatory Guidelines.  In listing the cases that comprise the circuit split, Justice Sotomayor recognized that the First Circuit had not yet taken a position on the issue, but she noted her view that we had "strongly hint[ed] yes" in Moore v. United States, 871 F.3d 72, 80-83 (1st Cir. 2017).  See Brown, 139 S. Ct. at 15-16.  We briefly discuss Moore in Section II.B.

presents an important question of federal law that has divided the courts of appeals and in theory could determine the liberty of over 1,000 people").[11]

**B.  Federal Habeas Review**

To obtain the post-conviction relief that he seeks pursuant to § 2255 -- resentencing to a lower term of imprisonment -- Bartolomeo must show that "his sentence 'was imposed in violation of the Constitution or laws of the United States' or 'is otherwise subject to collateral attack.'"  Wilder v. United States, 806 F.3d 653, 658 (1st Cir. 2015) (quoting 28 U.S.C. § 2255(a)).  Bartolomeo says he has accomplished that showing based on the unconstitutional vagueness of the Guidelines' career-offender provision.  However, because he did not assert such a claim at his sentencing or on direct appeal -- a procedural default -- Bartolomeo would not be entitled to resentencing even if we agreed with him unless he also can show "'cause' that excuses the procedural default and 'actual prejudice' resulting from the alleged error."  Id. (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)).  Cause exists if the "claim was 'so novel that its legal basis [wa]s not reasonably available to counsel' at the time of the default."  Lassend v. United States, 898 F.3d 115, 122

---

[11]  As Justice Sotomayor noted, "after Johnson [II], the Sentencing Commission deleted the residual clause from the Guidelines."  Brown, 139 S. Ct. at 15 (citing U.S.S.G. § 4B1.2(a)(2) (2016)).

(1st Cir. 2018) (alteration in original) (quoting Reed v. Ross, 468 U.S. 1, 16 (1984)).  For actual prejudice, Bartolomeo "must show that 'there is a reasonable probability' that" he would have received a different sentence "but for the alleged error."  Wilder, 806 F.3d at 658 (quoting Strickler v. Greene, 527 U.S. 263, 289 (1999)).

Before addressing the habeas court's holdings on cause and prejudice, we pause to describe an additional barrier that Bartolomeo needed to scale in this case.  Because he previously had filed unsuccessful motions under § 2255 attacking his sentence, Bartolomeo could not file this successive motion without certification from our court that he is relying on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  28 U.S.C. § 2255(h)(2).[12]

In late 2017, a First Circuit panel authorized Bartolomeo's challenge to his career-offender designation, see Bartolomeo v. United States, No. 16-1317 (1st Cir. Nov. 17, 2017) (judgment granting leave to file successive § 2255 motion), based on two then-recent First Circuit decisions certifying habeas petitions raising career-offender claims premised on Johnson II.

---

[12] Another subsection of § 2255(h) pertains to newly discovered evidence and is inapplicable here.  See 28 U.S.C. § 2255(h)(1).

One of those cases was Moore, the decision noted by Justice Sotomayor in her Brown dissent. See supra Section II.A. The other, Hardy v. United States, 871 F.3d 85 (1st Cir. 2017), was issued at the same time as Moore, and it summarily certified the Johnson II issue raised there based on the reasoning set forth in Moore. See Hardy, 871 F.3d at 86 (certifying a successive § 2255 motion "insofar as it argues that Johnson II invalidates the residual clause of the pre-Booker career offender guideline").

Notably, however, we did not decide in Moore and Hardy that the Johnson II claims were meritorious; rather, consistent with applicable law, we determined only that the defendants had met their burden to show the "possible merit" of the claims. Moore, 871 F.3d at 78 (quoting Rodriguez v. Superintendent, Bay State Corr. Ctr., 139 F.3d 270, 273 (1st Cir. 1998), abrogated in part by Bousley v. United States, 523 U.S. 614 (1998)).[13]

---

[13] The "possible merit" of the claims accomplished the prima facie showing that is among several statutory requirements aimed at ensuring accelerated review of certification requests. See Moore, 871 F.3d at 77 (describing the appellate court's consideration of such requests as "fast, unreviewable, and limited"). Under § 2255(h), "[a] second or successive motion must be certified as provided in section 2244." The latter provision, inter alia, imposes a thirty-day deadline to rule on certification, 28 U.S.C. § 2244(b)(3)(D); states that a grant or denial is neither appealable nor subject to rehearing, id. § 2244(b)(3)(E); and permits the petition upon a prima facie showing that the claim relies on "a new rule of constitutional law," previously unavailable, that the Supreme Court has "made retroactive to cases on collateral review," id. § 2244(b)(3)(C),(2)(A).

In brief, the Moore panel found the requisite merit in the petitioner's argument that the pre-Booker Guidelines were sufficiently binding on sentencing judges that the career-offender residual clause under that regime was equivalent to the ACCA's residual clause and, hence, suffered from the same constitutional flaw. See 871 F.3d at 81-82; see also id. at 82 ("[I]f one takes seriously, as we must, the Court's description of the pre-Booker guidelines as 'mandatory,' one might describe the residual clause of the pre-Booker guidelines as simply the ACCA's residual clause with a broader reach, in that it fixed increased minimum and maximum sentences for a broader range of underlying crimes."). Ultimately, however, the panel left it to the district court to decide "whether the pre-Booker guidelines fixed Moore's sentencing range in the relevant sense that the ACCA fixed sentences." Id. at 84.[14] The district court did subsequently allow Moore's petition to vacate and correct his sentence. See United States v. Moore, No. 1:00-10247-WGY-1, 2018 WL 5982017, at *3 (D. Mass. Nov. 14, 2018).

Our court's certification of Bartolomeo's similar Johnson II claim allowed him to file his § 2255 motion in district

---

[14] The Moore panel noted the possibility that Johnson II might not apply categorically to the pre-Booker Guidelines: "If there is . . . a difference in how mandatory the pre-Booker guidelines were from case to case, then it may well be necessary to invalidate the residual clause for those defendants for whom the guidelines fixed sentences but not for others." 871 F.3d at 84.

- 20 -

court, resulting in the decision -- described below -- that is now on appeal.

**C.  The Decision on Habeas Review**

In discussing Bartolomeo's claim, the habeas court began by addressing the merits of the issue we did not definitively resolve in Moore: whether the pre-Booker residual clause had the same constitutional flaw as the ACCA's identical clause.  The court accepted the view adopted by several other judges within the District of Massachusetts that "petitioners sentenced under the residual clause of the mandatory, pre-Booker career offender guideline may be entitled to resentencing under Johnson II." Bartolomeo v. United States, 316 F. Supp. 3d 539, 546 (D. Mass. 2018); see also, e.g., Boria v. United States, 427 F. Supp. 3d 143, 149 (D. Mass. 2019); United States v. Roy, 282 F. Supp. 3d 421, 425-28 (D. Mass. 2017); Reid v. United States, 252 F. Supp. 3d 63, 66-68 (D. Mass. 2017).  Therefore, because Bartolomeo's predicate crimes no longer qualified for career-offender status, the court went on to consider whether Bartolomeo satisfied the requirements for habeas relief.

Relying on earlier precedent in the District, the court readily concluded that Bartolomeo had shown "cause" for his procedural default in failing to previously raise the career-offender claim.  See 316 F. Supp. 3d at 546.  The court quoted multiple decisions opining that the cause requirement was plainly

met, including the observation in United States v. Lattanzio that, "[i]n 1995, when Defendant here was sentenced, any argument based on the rationales approved twenty years later in the Johnson cases would have been not only novel, but practically unimaginable." 232 F. Supp. 3d 220, 223 (D. Mass. 2017); see also, e.g., United States v. Webb, 217 F. Supp. 3d 381, 390 (D. Mass. 2016) (referring to "the monumental shift that Johnson II created in sentencing").

However, the court found that Bartolomeo's circumstances differed from "the ordinary Johnson [II] case, [in which] cause and prejudice are the twinned results of sentencing for offenses that no longer qualify as career offender predicates." Bartolomeo, 316 F. Supp. 3d at 546. Based on its review of the record, the court concluded that, although Bartolomeo's career-offender status was factored into the sentencing judge's calculation of the applicable Guidelines range, the judge did not rely on the GSR calculation in sentencing Bartolomeo. See id. at 546-47. Rather, it was the "joint motion for upward departure that ultimately determined the sentence." Id. at 547. The court further found that the plea agreement indicated "petitioner's assent [to the thirty-five-year term] irrespective of any career offender designation." Id.

Hence, the court held, because Bartolomeo failed to show that his sentence was affected by his career-offender status, he has "not shown a reasonable probability that, but for his career

offender designation, he would have received a different sentence." Id. The court therefore denied the petition for habeas relief for failure to show actual prejudice. Id. at 548.

## III.

On appeal, Bartolomeo argues that the habeas court misread the record in disregarding the impact of his career-offender status on his sentencing. Bartolomeo claims, inter alia, that he would not have agreed to a thirty-five-year term of imprisonment if the starting point for departure had been a GSR capped at about sixteen years (151-188 months) rather than the roughly twenty-seven-year cap (262-327 months) resulting from the career-offender GSR. In effect, he claims that he bargained for, and agreed to, an upward departure of about eight years, not nearly twenty years.

For its part, the government not only defends the habeas court's assessment of the record on prejudice, but it also urges us to conclude that Bartolomeo failed to show cause for his procedural default. It further argues that we should conclude that the pre-Booker Guidelines were "insufficiently 'mandatory'" to fall within Johnson II's holding, both in general and as applied to Bartolomeo's specific circumstances. Finally, the government contends that Bartolomeo's petition is untimely because the Supreme Court has not yet recognized "the right asserted," 28 U.S.C. § 2255(f)(3) -- i.e., he is not entitled to an extension of

- 23 -

the one-year limitations period for habeas petitions because Johnson II did not establish the unconstitutionality of the pre-Booker career-offender guideline. See 28 U.S.C. § 2255(f)(3) (stating that the "1-year period of limitation . . . shall run from the latest of-- . . . the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review").

In addressing the competing arguments, we review the district court's findings of fact for clear error and its legal rulings de novo. Lassend, 898 F.3d at 122.

## A. The Government's Alternative Bases for Disposition

We begin by putting to one side the government's proposed alternative rationales for upholding the denial of Bartolomeo's habeas petition -- that is, the reasons other than a lack of actual prejudice. Those rationales all require novel legal rulings that are unnecessary if we agree with the habeas court's view that the record reveals no reasonable probability that Bartolomeo would have received a different sentence absent his classification as a career offender. Although the First Circuit panel that certified Bartolomeo's claim concluded that he made a prima facie showing of merit on the applicability of Johnson II to the pre-Booker Guidelines residual clause, any substantive holding by us beyond

- 24 -

that threshold would be dicta if Bartolomeo cannot show actual prejudice. We therefore turn to the prejudice question.

## B. Assessing Prejudice

As Bartolomeo acknowledges, the prejudice inquiry -- whether he has shown "a reasonable probability," Strickler v. Greene, 527 U.S. 263, 289 (1999), that he would have received a different sentence "but for the alleged error," Wilder, 806 F.3d at 658 -- is fact-dominated. Our review of the habeas court's finding is therefore for clear error.

Bartolomeo argues that the roughly twelve-year difference between the top of the career-offender guideline range -- 327 months -- and the top of the otherwise applicable range -- 188 months -- is the "actual prejudice" he suffered. In other words, with the same amount of departure -- roughly eight years from the top of the range -- he claims his sentence without career-offender status should be about twenty-three years instead of thirty-five. Bartolomeo appears to rely on two primary theories in arguing that his career-offender status played a role in the sentencing judge's imposition of the thirty-five-year term. First, he emphasizes the sentencing court's repeated reference to the Guidelines throughout the plea and sentencing proceeding as evidence that his sentence was anchored in the Guidelines, including the career-offender enhancement. Second, Bartolomeo maintains that his career-offender status was built into the plea

- 25 -

agreement and joint motion for upward departure and, hence, adoption of the parties' recommendation necessarily incorporated that status.  We begin with the latter contention.

### 1.  The Parties' Recommendation

The record amply supports the habeas court's finding that Bartolomeo's career-offender status played no role in the parties' selection of the thirty-five-year term specified in both the plea agreement and the joint motion.  The motion simply proposed the upward departure to thirty-five years "from the guideline range otherwise applicable to Bartolomeo."  The plea agreement likewise lacks any indication that Bartolomeo's designation as a career offender influenced the sentencing recommendation.  Even the initial version of the agreement -- which predated the PSR's report of Bartolomeo's career-offender status -- called for the same thirty-five-year sentence.  See Bartolomeo, 316 F. Supp. 3d at 547.  Moreover, the signed plea agreement stated that the parties had not agreed on a CHC; if the parties had presumed career-offender status, the CHC would have been VI.

In addition, during the plea proceeding itself, the government attorney stated that, "[u]nder the plea agreement . . . I believe the total offense level would be 32" -- an indication that the agreement did not contemplate career-offender status.  The government attorney also indicated that the career-offender enhancement was irrelevant, stating that, "in light of

- 26 -

the agreement" and departure motion, defense counsel had no reason to object to the PSR's career-offender determination. See supra Section I.C. Indeed, defense counsel did not object to that interpretation of the parties' agreement; he did not interject to clarify, for example, that career-offender status was pertinent, albeit subsumed within the thirty-five-year recommendation.

In his reply brief, Bartolomeo criticizes the government's suggestion that defense counsel's failure to object to the career-offender classification "shows the irrelevance of [that] designation" to the sentence. Bartolomeo claims that, to the contrary, his counsel did not object because it was "well-settled in this Circuit that the Petitioner's objections to the Petitioner's predicate offenses would have been futile." The question for us, however, is not defense counsel's actual motivation for acquiescing to the prosecutor's statement -- a matter of speculation -- but whether the habeas court clearly erred in drawing the inference urged by the government. It did not.

Bartolomeo also highlights the provision that was added to his plea agreement after its first iteration, in which he was granted the right "to petition the Court, pursuant to 28 U.S.C. § 2255, at any time for application of any future decision, ruling, change in law or change in the Sentencing Guidelines, which may result in a reduction in the total time of the Defendant's incarceration." He asserts in his appellate brief that he was

"stunned that his two prior assault convictions would render him a career offender" and states that he "insisted" on including this new provision, Paragraph 8(c), "to afford him the ability to later challenge his sentence if circumstances afforded him grounds to do so."

But the plea agreement does not indicate that Paragraph 8(c) was added to the agreement with Bartolomeo's career-offender status in mind; it could apply to the drug quantity table that produced his BOL of 32 -- a sentencing component that was referenced in the plea agreement. Thus, even if the recommendation for a thirty-five-year term of imprisonment sprung from a Guidelines starting point, the agreement and motion do not show that starting point as necessarily the career-offender range.

Bartolomeo also makes the slightly different argument that Section 8(c) -- preserving his ability to benefit from changes in Guidelines law -- demonstrates that the thirty-five-year term has two discrete segments: the applicable Guidelines sentence and the departure pursuant to U.S.S.G. § 4A1.3(e) (1997). From that premise, he claims that he was harmed by the career-offender error in the Guidelines segment of his sentence. However, as our discussion above demonstrates, the habeas court supportably found that "petitioner's career offender status . . . is entirely absent in the plea agreement and joint motion for upward departure" -- i.e., the court determined that the recommended sentence would

have been the same whether the guideline range was 151-188 months or, with the career-offender enhancement, 262-327 months. 316 F. Supp. 3d at 547.

The remaining question is whether Bartolomeo's career-offender status also was "entirely absent" from the sentencing court's decision to impose the recommended thirty-five-year term.

## 2. The Sentencing Proceeding

Bartolomeo is certainly correct that the sentencing court gave attention to the Guidelines calculation during each portion of the joint proceeding. Before accepting Bartolomeo's plea, the court confirmed that Bartolomeo understood that his guideline range -- with the career-offender designation -- would be "21 years and some months to 25 years and some months." See supra Section I.C.1. The court also ascertained during the plea colloquy that the career-offender guideline may be applied at sentencing without notice to a defendant and that, in this case, Bartolomeo had not contested the PSR's assessment that he was a career offender. The court revisited the Guidelines details at the outset of the sentencing portion of the proceeding, again reviewing the elements -- including career-offender status -- that produced the 262- to 327-month GSR.

Despite this attention to the Guidelines, we see no clear error in the habeas court's finding that the sentencing judge accepted the proposed thirty-five-year term without regard for the

term of imprisonment that would have otherwise applied -- i.e., without regard to the length of the departure. The sentencing court's focus on the Guidelines was in keeping with its obligation to begin with that generalized calculation before moving on to determine the appropriate sentence for the particular defendant in the context of the case before it. Indeed, before embarking on the Guidelines math in the sentencing portion of the hearing, the court, in effect, previewed the likelihood that it would disregard the calculation: "[T]hough I'm going to do the sentencing guideline calculations, I am disposed to depart upward on the grounds of the joint motion." In other words, the court explained, it would determine the sentence prescribed by the Guidelines, **"but [the] sentence will be based on the motion," not the "calculations."

Bartolomeo points to the Statement of Reasons page of the sentencing court's formal Judgment as evidence that the Guidelines played a role in the court's decision. That document inconsistently reports Bartolomeo's TOL as 32 -- i.e., the offense level without career-offender status -- but lists the CHC (VI) and guideline range (262-327 months) applicable to Bartolomeo as a career offender. Neither the recording of the career-offender data nor the evident error in the corresponding TOL aids Bartolomeo's appeal. As Bartolomeo emphasizes, the court was required to calculate the Guidelines range and inform him of it. The court's having done so does not demonstrate that Bartolomeo's

career-offender status affected its decision to impose the thirty-five-year term.[15]

Bartolomeo's complaint that a nineteen-to-twenty-two-year departure is a disproportionate increase over the correct guideline range -- and his career-offender status therefore must have played a role -- falls flat when that increase is juxtaposed with the risk he faced of a substantial additional term of imprisonment if he had been prosecuted for an intentional murder. Bartolomeo additionally contends that the parties' choice of a non-binding sentencing recommendation, see Fed. R. Crim P. 11(c)(1)(B), refutes the notion that he received a fixed thirty-five-year sentence independent of his GSR. However, we fail to see how the sentencing judge's authority to reject the parties' proposed term of imprisonment tells us whether the judge relied on Bartolomeo's career-offender status when it decided to impose the agreed-upon thirty-five-year sentence. As our discussion above makes clear, that is a factual question necessarily answered through a close review of the record.

In sum, the habeas court did not clearly err in finding that Bartolomeo "has not shown a reasonable probability that his

---

[15] Bartolomeo's assertion that he would not have accepted the thirty-five-year sentence recommendation but for his career-offender designation is beside the point. Our task is to examine the court's rationale for imposing the term, not Bartolomeo's reasons for accepting it.

sentence would have been different absent [the career-offender] designation." 316 F. Supp. 3d at 548. We therefore affirm the court's denial of Bartolomeo's petition seeking to reduce his sentence.

So ordered.