# United States Court of Appeals
## For the First Circuit

No. 17-1899

ANTHONY M. SHEA,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Thompson, Selya, and Barron,
Circuit Judges.

Wade M. Zolynski, Federal Public Defender Office, for
appellant.
Seth Aframe, Assistant United States Attorney, for appellee.

September 28, 2020

**THOMPSON, Circuit Judge.** In <u>Johnson</u> v. <u>United States</u>, 576 U.S. 591, 597 (2015), the Supreme Court held that a jumble of words in a federal law could not be used to fix a defendant's sentence, a rule that applies retroactively. See <u>Welch</u> v. <u>United States</u>, 136 S. Ct. 1257, 1264 (2016). Years ago, judges used the same wording in another binding rule with "the force and effect of law[ ]," <u>United States</u> v. <u>Booker</u>, 543 U.S. 220, 234 (2005) — § 4B1.2(a)(2) of the U.S. Sentencing Guidelines — to fix defendants' sentences. Because <u>Johnson</u> made that unconstitutional, we reverse the district court's decision denying the motion to vacate and remand for further proceedings.

## Background

Twenty-five years ago, Anthony M. Shea drove a stolen minivan to try to rob a bank in Londonderry, New Hampshire. See <u>United States</u> v. <u>Shea</u>, 159 F.3d 37, 38 (1st Cir. 1998). Using a pair of revolvers, Shea and another robber marched two bank tellers to the vault. <u>Id.</u> When the tellers couldn't open it (a timed locking device kept it shut), Shea and his partner left empty-handed. <u>Id.</u> One week later, Shea's criminal career came to an abrupt stop: after another aborted robbery in neighboring Massachusetts, his getaway car hit a telephone pole. See <u>United States</u> v. <u>Shea</u>, 150 F.3d 44, 47 (1st Cir. 1998). A squad of FBI agents, who'd been in hot pursuit, pulled Shea from the wreckage and a black revolver from his pants. See <u>id.</u> One of the

- 2 -

Londonderry tellers later identified the gun as the weapon Shea had used in New Hampshire. Shea, 159 F.3d at 38.

For the Londonderry robbery, Shea was tried in the federal court for the District of New Hampshire, where a jury found him guilty of four charges: armed attempted bank robbery under 18 U.S.C. § 2113(a) and (d), using a firearm during a crime of violence under 18 U.S.C. § 924(c), interstate transportation of a stolen vehicle under 18 U.S.C. § 2312, and interstate possession of a stolen vehicle under § 2312. Id. at 38. For purposes of Count Two, § 924(c)(3) defined "crime of violence" as a felony offense that

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). The government alleged that Count One — the armed attempted bank robbery — qualified as a "crime of violence." Soon after the guilty verdict, the judge sentenced Shea to 567 months (that is, over forty-seven years) in federal prison, where he dwells to this day.[1]

---

[1] Shea was also prosecuted in the District of Massachusetts for the aborted robbery there and received a sentence of 382 months in prison. Shea, 150 F.3d at 47. Today, he is also serving a life sentence for a later set of convictions for a string of bank

At the time, the U.S. Sentencing Guidelines ordinarily set the range of sentences the judge could impose. Then, as they do now, the Guidelines gave each defendant two scores — an "offense level" (based on the seriousness of his offense of conviction, plus specified aggravating and mitigating facts in the defendant's particular case) and a "criminal history category" (based on the defendant's prior convictions). United States v. Martínez-Benítez, 914 F.3d 1, 2 n.2 (1st Cir. 2019). The judge plotted those two scores on a chart and got the applicable sentencing range. Id. When Shea was sentenced, the Guidelines were "mandatory and binding on all judges." Booker, 543 U.S. at 233.

To begin with, Shea's crimes of conviction and (fairly long) criminal history gave him an offense level of 28 and a criminal history category of V. See U.S. Sentencing Guidelines Manual ch. 3, pt. A (U.S. Sentencing Comm'n 1995) (hereinafter "U.S.S.G."). Standing alone, that would have yielded a Guideline range of 130-162 months in prison, plus the mandatory twenty-year consecutive sentence for his § 924(c) conviction, which was unaffected by the Guideline calculation — nothing to shrug off. As then required, however, the judge classified Shea as a "Career Offender" under § 4B1.1, which applies when a defendant commits his third "crime of violence" or "controlled substance offense."

and armored car robberies he and his gang committed in the mid-90s. See United States v. Shea, 211 F.3d 658, 664 (1st Cir. 2000).

- 4 -

U.S.S.G. § 4B1.1.  At the time, the Guidelines defined "crime of violence" like the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B), defined "violent felony":  as a felony offense that

> (1)  has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2)  is burglary of a dwelling, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another.*

U.S.S.G. § 4B1.2(a) (1997) (emphasis added).  (Stick a pin in this: the first sentence is known as the "force clause" and the last, catch-all phrase is known as the "residual clause").  The court determined that two of Shea's past convictions — one in 1982 for federal armed bank robbery and another in 1992 for assault and battery on a police officer ("ABPO") under Massachusetts law — both fit the bill.  At the time, they were both qualifying offenses under the residual clause.  See United States v. Fernandez, 121 F.3d 777, 778–80 (1st Cir. 1997); United States v. McVicar, 907 F.2d 1, 1 (1st Cir. 1990).  The Career Offender Guideline rocketed Shea's Guideline range (again minus the twenty-year § 924(c) tack-on) from 130–162 months to 262–327 months in prison.  Because the Guidelines were mandatory, and no one (including the judge) identified any ground for departure, Shea claims that none was

- 5 -

available, which meant the judge had to sentence him within the Guideline range.

A lot changed in the next twenty years. In Booker, the Supreme Court held the mandatory Guidelines system unconstitutional and struck the provision that made them binding on judges. 543 U.S. at 245. Now the Guidelines are "effectively advisory." Id. "Although [they] remain 'the starting point and the initial benchmark' for sentencing, a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court 'must make an individualized assessment based on the facts presented' and the other statutory factors." Beckles v. United States, 137 S. Ct. 886, 894 (2017) (quoting Gall v. United States, 552 U.S. 38, 49-50 (2007); see also Gall, 522 U.S. at 50 (explaining that a sentencing judge may not even "presume the [guideline] range is reasonable").

Then, five terms ago, the Court held that "imposing an increased sentence under the residual clause of the [ACCA] violates the Constitution's guarantee of due process" because the clause was unconstitutionally vague. Johnson, 576 U.S. at 606. In doing so, the Court overturned its own precedent and announced a "new rule" of law — a rule not "dictated by precedent." Welch, 136 S. Ct. at 1264 (emphasis omitted) (quoting Teague v. Lane, 489 U.S. 288, 301 (1989)). "Generally, new rules of law do not apply to cases concluded before the new law is recognized." Butterworth v.

- 6 -

United States, 775 F.3d 459, 463 (1st Cir. 2015). But the Supreme Court soon made clear that Johnson triggered an exception: as a "substantive" rule that curbed the scope of a criminal law (the ACCA), it applies retroactively. See Welch, 136 S. Ct. at 1265–68.

Within a year after the Johnson decision, Shea moved to vacate his conviction and sentence under 28 U.S.C. § 2255, urging that the Court's reasoning in Johnson made the similar residual clauses in § 924(c) and § 4B1.2(a) unconstitutionally vague, as well. Shea argued that shorn of that clause, § 924(c) did not support his conviction for carrying a firearm in relation to a "crime of violence," and the pre-Booker Career Offender Guideline wrongfully enhanced his sentence. He urged (as he does on appeal) that his instant conviction for armed attempted bank robbery under federal law did not satisfy § 924(c)'s force clause, and that none of his prior convictions — including for federal armed bank robbery, Massachusetts ABPO, and Massachusetts assault and battery ("A&B") — satisfied § 4B1.2(a)'s force clause or matched the generic offenses it enumerates. See United States v. Faust, 853 F.3d 39, 58 (1st Cir. 2017) (holding intentional ABPO is not a violent felony under the ACCA's identical force clause); see also United States v. Rose, 896 F.3d 104, 110, 115 (1st Cir. 2018) (explaining that crimes carrying a mens rea of ordinary recklessness, including assault and battery with a dangerous

- 7 -

weapon under Massachusetts and Rhode Island law, are not violent felonies under the force clause). Shea therefore asked the judge to vacate his § 924(c) (Count Two) conviction and resentence him without the Career Offender enhancement.

Generally, the federal habeas statute demands a prisoner file any motion to vacate within a year of "the date on which the judgment of conviction became final." 28 U.S.C. § 2255(f)(1). There are exceptions, though. Section 2255(f)(3) restarts the one-year clock on "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." Using that springboard, Shea claimed that Johnson reopened the one-year window to mount his vagueness challenges to the § 924(c) and § 4B1.2(a)(2) residual clauses, so the court should vacate his § 924(c) conviction and resentence him without the career-offender enhancement.

The district judge disagreed and dismissed Shea's claims. Shea had blown the usual one-year post-conviction deadline, and § 2255(f)(3) did not apply, the judge held. He acknowledged that Johnson "newly recognized" a retroactive rule. But he held that subsection (f)(3)'s exception required more. In his view, "§ 2255(f)(3) does not come into play unless reasonable jurists would agree that the new rule on which the petition is based dictates the result that the petitioner seeks." "Absent

such agreement," he'd held before, "the prisoners' claimed right must itself be treated as a new right that must await recognition by the Supreme Court before the statute of limitations can be restarted by § 2255(f)(3)." Kucinski v. United States, No. 16-CV-201-PB, 2016 WL 4926157, at *4 (D.N.H. Sept. 15, 2016). Applying that framework to this case, he concluded that judges could reasonably debate whether the rule minted in Johnson made the residual clauses in the pre-Booker Guidelines or § 924(c) unconstitutionally vague, and therefore, Shea's petition was too late (because it was filed long after his conviction became final) and premature (because the Supreme Court had not yet "recognized" a right that would entitle Shea to relief). Acknowledging that the issue wasn't clear-cut, however, the judge granted a certificate of appealability on the question of whether § 2255(f)(3) reopened the one-year period for Shea to bring his Johnson-based attacks on his conviction and sentence. Shea took the invite and appealed.

## Framing the Issue

While Shea's appeal was pending, the Supreme Court decided United States v. Davis, which held that § 924(c)'s residual clause was unconstitutionally vague. 139 S. Ct. 2319, 2336 (2019). In light of Davis, the parties now agree that Shea's Johnson-based challenge to his § 924(c) conviction is timely, and that we should remand for the district court to address whether Shea's conviction

- 9 -

for armed attempted bank robbery under 18 U.S.C. § 2113(a) and (d) qualifies as a crime of violence under § 924(c)'s surviving elements clause.[2]

With that settled, the only question left is whether _Johnson_ reopened the one-year window for any _Johnson_-based challenges to the pre-_Booker_ Guidelines' residual clause. Most of our sister circuits have held it did not. See _Nunez v. United States_, 954 F.3d 465, 467 (2d Cir. 2020); _United States v. London_, 937 F.3d 502, 503 (5th Cir. 2019); _United States v. Blackstone_, 903 F.3d 1020, 1023 (9th Cir. 2018); _Russo v. United States_, 902 F.3d 880, 883 (8th Cir. 2018); _United States v. Green_, 898 F.3d 315, 321 (3d Cir. 2018); _United States v. Greer_, 881 F.3d 1241, 1248 (10th Cir. 2018); _United States v. Brown_, 868 F.3d 297, 303 (4th Cir. 2017); _Raybon v. United States_, 867 F.3d 625, 629-30

---

[2] Before us, the parties focused on the issue of whether attempted bank robbery under § 2113(a) constitutes a "crime of violence" under § 924(c). Although we leave the merits of the § 924(c) issue for the district court to take the first (and maybe the only) crack at it, we add that it appears Shea was convicted of the enhanced version of the offense -- not just attempted bank robbery under § 2113(a) but _armed_ attempted bank robbery under § 2113(d). This difference may be significant. See _United States v. Johnson_, 899 F.3d 191, 204 (3d Cir. 2018) ("_Johnson_ focuses on § 2113(a) . . . [h]owever, Johnson was not convicted under § 2113(a), but rather § 2113(d) . . . ."); _United States v. Taylor_, 848 F.3d 476, 493 (1st Cir. 2017) (analyzing similar challenge to a § 924(c) conviction in light of "the enhancement provisions that applied to Taylor's conviction"); see also _Simpson v. United States_, 435 U.S. 6, 13 n.6 (1978) (discussing § 2113(d)); _United States v. Spinney_, 65 F.3d 231, 236 (1st Cir. 1995) (same).

- 10 -

(6th Cir. 2017).  That these decisions have snowballed down one path doesn't mean we should follow them, though.  See In re Atlas IT Exp. Corp., 761 F.3d 177, 182–83 (1st Cir. 2014) (citing the "phenomenon in our courts of appeal and elsewhere — sometimes called 'herding' or 'cascading'" under which later successive courts to address a question "are increasingly more likely to simply go along with the developing group consensus").  Indeed, one circuit and most trial judges in ours have reached the opposite conclusion.  See Cross v. United States, 892 F.3d 288, 293–94, 304–06 (7th Cir. 2018).[3]  Though we take a different route than the Seventh Circuit's, we hold that § 2255(f)(3) authorizes Shea

---

[3] See Diaz-Rodriguez v. United States, C.A. No. 16-2064, 2020 WL 265932, at *1 (D.P.R. Jan. 17, 2020); Boria v. United States, 427 F. Supp. 3d 143, 149 (D. Mass. 2019); United States v. Moore, Cr. No. 00-10247, 2018 WL 5982017, *2-3 (D. Mass. Nov. 14, 2018); Bartolomeo v. United States, 316 F. Supp. 3d 539, 546 (D. Mass. 2018); United States v. Roy, 282 F. Supp. 3d 421, 427-428 (D. Mass. 2018); Reid v. United States, 252 F. Supp. 3d 63, 66-68 (D. Mass. 2017); see also Hodges v. United States, 778 F. App'x 413, 414-15 (9th Cir. July 26, 2019) (Berzon, J., concurring) (arguing Blackstone was wrongly decided); Chambers v. United States, 763 F. App'x 514, 528 (6th Cir. Feb. 21, 2019) (Moore, J., concurring) (arguing Raybon was wrongly decided); London, 937 F.3d at 510-11 (Costa, J., concurring) (arguing that the Fifth Circuit is "on the wrong side of a split over the habeas limitations statute"); Brown, 868 F.3d at 304–311 (Gregory, C.J., dissenting); United States v. Carter, 422 F. Supp. 3d 299, 314–17 (D.D.C. 2019); United States v. Hammond, 354 F. Supp. 3d 28, 40 (D.D.C. 2018).

to litigate his Johnson-based challenge to his sentence on its merits.

We start with the common ground. The parties agree that to show his petition is timely under § 2255(f)(3), Shea "needs to establish that [Johnson]: (1) recognized a new right that is (2) 'retroactively applicable' on collateral review." Butterworth, 775 F.3d at 464. They agree that he has. In the government's telling, however, it is not enough that Shea relies on the rule minted in Johnson. Rather (it goes on) the rule from Johnson must "necessarily dictate" that the residual clause in pre-Booker Guidelines was unconstitutionally vague. In other words (runs the argument), if to grant Shea's petition, the habeas court would need to craft a *new* right — meaning a new rule of law — beyond the one "recognized" in Johnson, then Shea's claim is too early, and Johnson did not restart the clock under § 2255(f)(3). See London, 937 F.3d at 506-09 (using this approach); Russo, 902 F.3d at 883 ("[T]he timeliness of [a Johnson-based] claim depends on whether [the petitioner] is asserting [only] the right initially recognized in Johnson or whether he is asserting a different right that would require the creation of a second new rule."); Kucinski, 2016 WL 4926157, at *4 (same).

The Seventh Circuit has rejected this third step, saying it "improperly reads a merits analysis into the limitations period." Cross, 892 F.3d at 293-94 (holding that under

- 12 -

§ 2255(f)(3), the petitioner only had to "claim the benefit of [the] right that the Supreme Court has recently recognized" in Johnson and did not have to "*prove* that the right applie[d] to his situation"); Hammond, 354 F. Supp. 3d at 41 ("To 'assert' means '[t]o state positively' or '[t]o invoke or enforce a legal right.' Thus, in order to be timely under § 2255(f)(3), a § 2255 motion need only 'invoke' the newly recognized right, regardless of whether or not the facts of record ultimately support the movant's claim." (alterations in original) (quoting United States v. Snyder, 871 F.3d 1122, 1126 (10th Cir. 2017)). We have not decided the issue.[4] But since we side with Shea anyway, we assume without

---

[4] Our decision in Butterworth did not hold that § 2255(f)(3) requires that the right "newly recognized" by the Supreme Court must compel the relief the petitioner seeks, as the government suggests. There, we held that a recent Supreme Court case that announced a new rule did not apply retroactively to a petitioner sentenced before the case came down. 775 F.3d at 468. We did not hold that a new rule, if retroactive, would need to dictate the outcome on the merits of the petition in order for the petition to be timely. Indeed, in Moore v. United States, we held that a successive petition raising the same claim Shea does — a Johnson-based challenge to the pre-Booker Guidelines' residual clause — was timely under 28 U.S.C. § 2255(f)(3) because it was filed within one year after Johnson, even though we expressly declined to decide whether Johnson applied to the pre-Booker Guidelines. 871 F.3d 72, 77 n.3 (1st Cir. 2017). It is unclear if that statement in Moore binds us here, since our overall analysis (which chiefly concerned the requirements for filing a successive petition) was necessarily "tentative." Id. at 80.

deciding that the government and the district court read § 2255(f)(3) correctly.

Therefore, to see if Shea's petition is timely under § 2255(f)(3), we'll ask (based on the facts Shea asserts) if granting it would require the habeas court to forge a new rule of law not recognized in Johnson. "'[A] case announces a new rule'" if "'it breaks new ground or imposes a new obligation' on the government" — that is, "'if the result [is] not *dictated* by precedent[.]'" Chaidez v. United States, 568 U.S. 342, 347 (2013) (first alteration in original) (quoting Teague, 489 U.S. at 301). "And a holding is not so dictated" unless it "would [be] 'apparent to all reasonable jurists.'" Id. (quoting Lambrix v. Singletary, 520 U.S. 518, 527-528 (1997)). "But that account has a flipside": "a case does *not* 'announce a new rule when it is merely an application of the principle that governed' a prior decision to a different set of facts." Id. at 347-48 (alterations and internal quotation marks omitted) (quoting Teague, 489 U.S. at 307). So when a court "simply applie[s]" the same "constitutional principle" to a "closely analogous" case, it does not create a new rule. Yates v. Aiken, 484 U.S. 211, 216 (1988) (quoting Desist v. United States, 394 U.S. 244, 263 (1969) (Harlan, J., dissenting)).

In other words, our timeliness analysis under § 2255(f)(3) will overlap with the merits of Shea's claim, because we must determine whether Johnson establishes beyond reasonable

- 14 -

debate that the pre-Booker Guidelines' residual clause was too vague to constitutionally enhance a defendant's sentence, at least when no departure was applicable (as Shea asserts none was here). In a more preliminary posture, we've already held that there was a "reasonable likelihood" that the answer was yes: that a defendant who (like Shea) claimed he'd been subjected to an enhanced sentence because of the pre-Booker residual clause could challenge his sentence as violating the vagueness rule minted in Johnson. See Moore v. United States, 871 F.3d 72, 74, 80–84 (1st Cir. 2017) (holding the petitioner made a "prima facie" showing that his Johnson-based challenge ticked the boxes for filing a successive petition, at least where there was "no suggestion . . . that Moore qualified for a departure"). In this case, we go one step further: even applying the government's framework (i.e., the Teague test), we hold that Johnson dictates the rule Shea asserts: namely, that § 4B1.2(a)(2)'s residual clause was unconstitutionally vague and could not be applied to enhance the permissible range of sentences a judge could impose, as Shea claims it did in his case. As a result, we hold that Shea "asserts" the same right "newly recognized" in Johnson, making his petition

(filed within a year of that decision) timely. 28 U.S.C.
§ 2255(f)(3).[5]

## Analysis

### Johnson and Beckles

Johnson began with a well-established rule: that "the Government violates [the Fifth Amendment] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." 576 U.S. at 595 (quoting Kolender v. Lawson, 461 U.S. 352, 357–358 (1983)). Such vague laws violate "the first essential of Due Process." Id. at 595–96 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)). In the key phrase here, the Court explained: "These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." Id. at 596 (citing United States v. Batchelder, 442 U.S. 114, 123 (1979)). The Court then moved to the residual language at issue, which defined "violent felony" to include certain enumerated offenses and "any felony that involves conduct that presents a serious potential risk of physical injury to another." Id. at 593. That phrase, as the Court had long construed

---

[5] As we'll explain, we do not here decide whether Shea was in fact (as he contends) ineligible for a departure and exposed to higher sentences on account of the residual clause, but instead leave those merits issues for the district court to resolve.

it (to "require[ ] a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury"), left "grave uncertainty" about both "how to estimate the risk posed by a crime" and "how much risk it takes for a crime to qualify as a violent felony." Id. at 596–98. "Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process." Id. at 602. After Johnson, all but one circuit to address the issue held that "[§] 4B1.2(a)'s identically-worded [and interpreted] residual clause was unconstitutionally vague." United States v. Frates, 896 F.3d 93, 96 (1st Cir. 2018). In our circuit, the government "routinely" conceded that Johnson made the Guidelines' residual clause unconstitutionally void. Id.

Two years later, however, the Supreme Court held that although § 4B1.2(a)(2) contained the same vague language as the ACCA, the *advisory* Guidelines were "not subject to vagueness challenges." Beckles, 137 S. Ct. at 890. The Court made clear that under Johnson, "'statutes fixing sentences' . . . must specify the range of available sentences with 'sufficient clarity.'" Id. at 892 (first quoting Johnson, 576 U.S. at 596, then quoting Batchelder, 442 U.S. at 123). The ACCA had "fixed . . . a higher range of sentences for certain defendants" because it "*required* sentencing courts to increase a defendant's prison term from a

- 17 -

statutory maximum of 10 years to a minimum of 15 years" with a maximum of life. Id. (emphasis added). In contrast, though, the advisory Guidelines do not "fix the permissible range of sentences" a judge may legally impose. Id. They "merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range," and "'do not constrain that discretion.'" Id. at 894 (alteration omitted) (quoting Peugh v. United States, 133 S. Ct. 2072, 2089 (2013) (Thomas, J., dissenting)). For that reason, the Court held, they do not "implicate the twin concerns underlying the vagueness doctrine — providing notice and preventing arbitrary enforcement." Id.; Moore, 871 F.3d at 77 (explaining that "Beckles's reasoning relied on the conclusion that the post-Booker guidelines 'do not fix the permissible range of sentences,' and therefore 'do not implicate the twin concerns underlying vagueness doctrine'").

But what about pre-Booker sentences? Johnson and Beckles did not directly address the *mandatory* Guidelines that governed Shea's sentence. See Beckles, 137 S. Ct. at 903 n.4 (Sotomayor, J., concurring).[6] Many circuits seem to think that

---

[6] Unlike our sister circuits, we do not believe that Justice Sotomayor's oft-cited comment in her concurrence — that the Court left "open the question whether defendants sentenced to terms of imprisonment before our decision in [Booker] . . . may mount vagueness attacks on their sentences" — means that judges could reasonably debate whether Johnson applies to the pre-Booker Guidelines. Beckles, 137 S. Ct. at 903 n.4 (Sotomayor, J.,

- 18 -

ends the matter — holding that since the Court has not expressly held that the rule coined in Johnson applies to the pre-Booker Guidelines, a petitioner cannot rely on that rule to challenge a mandatory-Guideline career-offender sentence under § 2255(f)(3), even (apparently) if any reasonable jurist would conclude it applies to the mandatory Guidelines.[7]  But not even the government urges us to read § 2255(f)(3) so woodenly.  Nor could it:  as we

---

concurring).  First, the Justice's statement could easily be read to mean that the "open" question is whether prisoners sentenced before Booker — mostly all of whose convictions became final more than a year before Johnson — may invoke § 2255(f)(3) to "mount vagueness attacks on their sentences" (the question we answer yes to in this case).  Id.  Second, even if she meant to address the Teague question here (which was far afield from the issue presented), a non-controlling opinion for one justice is, of course, not binding on us.  Finally, in Stringer (discussed more below), the Court explained that its holding did not establish a "new rule" even though it answered a question a previous *majority* opinion had "express[ly]" deemed an "open" one.  Stringer v. Black, 503 U.S. 222, 230 (1992).

    [7] See Nunez, 954 F.3d at 470 (reasoning that "Johnson by its own terms addresses only the ACCA," so "the rule established in Johnson was specific" to that statute); Blackstone, 903 F.3d at 1026 (holding petition untimely because "[n]either Johnson nor Welch mentioned the mandatory or advisory Sentencing Guidelines"); Green, 898 F.3d at 321 (reasoning that "Johnson's holding as to the residual clause in the ACCA created a right only as to the ACCA" because "[i]t says nothing about a parallel right to not be sentenced under Sentencing Guidelines, whether advisory or mandatory"); Greer, 881 F.3d at 1248 ("[T]he only right recognized by the Supreme Court in Johnson was a defendant's right not to have his sentence increased under the residual clause of the ACCA," and the petitioner could not use § 2255(f)(3) "to apply the reasoning of Johnson in a different context not considered by the Court."); Brown, 868 F.3d at 303 (reasoning that "Johnson only recognized that ACCA's residual clause was unconstitutionally vague" and "did not touch upon" the Guidelines' identically-worded residual clause); Raybon, 867 F.3d at 630 (similar).

- 19 -

said in Moore, "Congress in § 2255 used words such as 'rule' and 'right'" because "it recognizes that the Supreme Court guides" — and indeed binds — "the lower courts not just with technical holdings" confined to the precise facts of each case "but with general rules that are logically inherent in those holdings." 871 F.3d at 82; see also Booker, 543 U.S. at 238 ("More important than the language used in our holding . . . are the principles we sought to vindicate."). As the government accepts, a rule or right recognized in one case can (and often does) control another with a "different set of facts." Chaidez, 568 U.S. at 348. So a decision striking one law often compels a court to undo another.

In Stringer v. Black, that's just what happened. 503 U.S. 222, 229 (1992). There, the Supreme Court held that its decision voiding one state's capital sentencing scheme (because it allowed the jury to return a death verdict based on an aggravating factor that state law defined too vaguely) "controlled" its later decision striking another state's law that used different language, so that the second case "did not announce a new rule." Id. at 228-29 ("[I]t would be a mistake to conclude that the vagueness ruling of Godfrey was limited to the precise language before us in that case."). Indeed, the Court went further. Although there were "differences in the use of aggravating factors" under each state's schemes, the Court concluded that "those differences could not have been considered a basis for denying

- 20 -

relief" in light of the principles established by other cases the Court had decided before the petitioner's conviction became final. Id. at 229-30.  In other words, the Supreme Court does not announce a new rule every time it applies the same constitutional principle to a new regulatory scheme.  "If a proffered factual distinction between the case under consideration and pre-existing precedent does not change the force with which the precedent's underlying principle applies, the distinction is not meaningful, and any deviation from precedent is not reasonable."  Wright v. West, 505 U.S. 277, 304 (1992) (O'Connor, J., concurring) (citing Stringer, 503 U.S. at 237).

*The Mandatory Guidelines*

Even so, says the government, the rule applied in Johnson does not control the pre-Booker Guidelines because, unlike the ACCA, the mandatory Guidelines were not "statutes" and do not "fix sentences" because they "did not increase the statutory minimum or maximum penalty facing the defendant."  To be sure (the government admits) "[t]he guideline regime cabined where within the statutory range the district court had to sentence the defendant," but it permitted departures in some circumstances.  At least three other circuits have found these distinctions provide reasonable grounds to debate whether Johnson's rule reaches the pre-Booker

Guidelines.[8]  One (and only one) circuit has actually debated the issue by holding that on the merits, the pre-Booker residual clause would be immune to Johnson-based vagueness challenges.  See In re Griffin, 823 F.3d 1350, 1354-55 (11th Cir. 2016) (reasoning that mandatory Guidelines differed meaningfully from the ACCA because they did not "alter the statutory sentencing range set by Congress for the crime").[9]  Shea disagrees with those cases.  By his logic, Johnson established that vague laws that fix the permissible range of sentences a judge can impose (by establishing a new mandatory minimum or maximum sentence) violate the Due Process Clause; the

_____

[8] See London, 937 F.3d at 507 (holding that voiding the pre-Booker residual clause would require a new rule because the Guidelines "did not statutorily increase the risk [the defendant] faced at sentencing" because "the statutory minimum and maximum sentence he faced remained the same"); United States v. Pullen, 913 F.3d 1270, 1281-82 (10th Cir. 2019) ("[C]entral to why the question remains open is that Johnson involved a federal statute, while the Guidelines, even in their mandatory form, were agency-created rules formed by the U.S. Sentencing Commission to supplement existing, congressionally-enacted statutory maximum and minimum sentencing ranges."); Russo, 902 F.3d at 883 (same because neither Johnson nor Beckles "addressed possible distinctions between a provision that establishes a statutory penalty and a mandatory guideline provision that affects sentences within a statutory range, subject to authorized departures").

[9] By the way, as we explained in Moore, that the Eleventh Circuit decided the merits differently in Griffin does not "mean that a contrary conclusion would be a new rule of constitutional law." 871 F.3d at 81; see Wright, 505 U.S. at 304 (O'Connor, J. concurring) (explaining that because "the standard for determining when a case establishes a new rule is 'objective,'" "the mere existence of conflicting authority does not necessarily mean a rule is new") (citing Stringer, 503 U.S. at 237).

vague § 4B1.2(a)(2) residual clause required the judge to sentence Shea to 262-327 months in prison (a sentence far greater than the statutory minimum); and therefore, his sentence violated the rule announced in Johnson.

As we previewed earlier, we side with Shea. "[B]ased on an objective reading of the relevant cases," Stringer, 503 U.S. at 237, the government's proffered distinctions between the ACCA and the mandatory Guidelines do "not change the force with which [Johnson's] underlying principle applies" when, as in most cases, the defendant was ineligible for a departure from the Guideline range. Wright, 505 U.S. at 304 (O'Connor, J., concurring).

### (i)  Statutes vs. Rules

To start with, given Supreme Court precedent, no reasonable jurist could think the rule in Johnson applies only to statutes. It is crystal clear that the same two-pronged vagueness test that governed Johnson applies with equal force to regulations that have the force of law. See FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute *or regulation* under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" (quoting United States v. Williams, 553 U.S. 285, 304 (2008)) (emphasis added)); accord Beckles, 137 S. Ct. at 894-95 (citing

- 23 -

_Fox_, 567 U.S. at 253, and framing the void-for-vagueness "question [as] whether a law" — not just a statute — "regulating private conduct by fixing permissible sentences provides notice and avoids arbitrary enforcement by clearly specifying the range of penalties available"). And as the Supreme Court held before _Booker_, the mandatory Guidelines were "the equivalent of legislative rules adopted by federal agencies." _Stinson_ v. _United States_, 508 U.S. 36, 45 (1993). "Because they [were] binding on judges," the Court had "consistently held that the Guidelines ha[d] the force and effect of laws." _Booker_, 543 U.S. at 234. So "the fact that [they] were promulgated by the Sentencing Commission, rather than Congress, lacks constitutional significance." _Id._ at 237; _see also_ _United States_ v. _R.L.C._, 503 U.S. 291, 297 (1992) (stating that "the answer to any suggestion that the statutory character of a specific penalty provision gives it primacy over administrative sentencing guidelines is that the mandate to apply the Guidelines is itself statutory," as we're about to explain).

### (ii) Fixing Sentences

In addition, unlike the advisory version, the mandatory Guidelines "_did_ 'fix the permissible range of sentences'" a judge could impose on certain defendants. _Beckles_, 137 S. Ct. at 903 n.4 (Sotomayor, J., concurring); _accord_ _Booker_, 543 U.S. at 243 (rejecting notion that "the Guidelines as currently written could be read as merely advisory provisions that recommended, rather

- 24 -

than required, the selection of particular sentences"). In fact, they did so by statute. As the Court explained in Booker, the Sentencing Reform Act ("SRA") required the judge to "'impose a sentence of the kind, and within the range' established by the Guidelines" in all but "specific, limited cases" in which the SRA allowed a departure. Id. at 234 (quoting 18 U.S.C. § 3553(b)). Therefore, at least in the ordinary case (where no departure was available), the Court held that *the Guidelines* — not the defendant's statute of conviction — set the relevant "maximum" sentence. Id. at 234. For that reason, the Supreme Court held that Guideline enhancements routinely violated the rule in Apprendi v. New Jersey — that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. 466, 490 (2000), because (at least in most cases) they raised the "legally permissible" range of sentences based on facts found by the judge, rather than a jury. Booker, 543 U.S. at 230-35; see also id. at 238 ("The Government correctly notes that in Apprendi we referred to 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum' . . . . [but the] principle[ ] [is] unquestionably applicable to the Guidelines.").

That the Guidelines allowed departures in "specific, limited cases" did not change the fact that in all others, they

- 25 -

worked no differently than a statute setting a sentencing range.

Id. at 234.  As the Court explained:

> The Guidelines permit[ted] departures from the prescribed sentencing range in cases in which the judge "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  18 U.S.C. § 3553(b)(1) (2000 ed., Supp. IV).  At first glance, one might believe that the ability of a district judge to depart from the Guidelines means that she is bound only by the statutory maximum.  Were this the case, there would be no Apprendi problem.  Importantly, however, departures [were] not available in every case, and in fact [were] unavailable in most.  In most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and <u>no departure will be legally permissible.  In those instances, the judge [was] bound to impose a sentence within the Guidelines range.</u>

Id. (emphasis added).  "Booker's case illustrat[ed] the mandatory nature of the Guidelines," the Court added:  as "a run-of-the-mill drug case, [it did] not present any factors that were inadequately considered by the Commission.  The sentencing judge would therefore have been reversed had he [departed and] not imposed a sentence within the . . . Guidelines range."  Id. at 235.  In other words, for most defendants — those who were not eligible for a departure — the mandatory Guidelines "fix[ed] the permissible range of sentences" the judge could impose.  Beckles, 137 S. Ct. at 892.

No, Booker did not apply the void-for-vagueness doctrine

- 26 -

or use the word "fix." Rather, it construed "the Sixth Amendment right of criminal defendants to be tried by a jury and to have every element of an offense proved by the Government beyond a reasonable doubt." Pepper v. United States, 562 U.S. 476, 489 (2011) (citing Booker, 543 U.S. at 243-44); see Alleyne v. United States, 570 U.S. 99, 111 (2013) (explaining that "'facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements" of a "'separate legal offense'" that must be charged in the indictment and found by the jury (quoting Apprendi, 530 U.S. at 483 n.10, 490)). In Beckles, however, the Court drew from the Booker line of cases to distinguish laws that "fix" sentences (which are subject to vagueness challenges) from laws that "merely guide" judicial discretion (which are not). Beckles, 137 S. Ct. at 892. Indeed, the Court indicated that it pulled the term "fixed" from Alleyne, which "describe[d] the legally prescribed range of available sentences as the penalty fixed to a crime." Beckles, 137 S. Ct. at 892.

In Alleyne, the Court made clear that under the Sixth Amendment analysis that doomed the mandatory Guidelines, a fact that raises either (maximum *or* minimum) end of the "the legally prescribed range of sentences to which a criminal defendant is exposed" necessarily changes "the penalty *affixed* to the [defendant's] crime." 570 U.S. at 112 (emphasis added) (reasoning

- 27 -

that "the legally prescribed range *is* the penalty affixed to the crime"); see also United States v. Haymond, 139 S. Ct. 2369, 2378 (2019) (plurality opinion) ("[B]y definition, a range of punishments includes not only a maximum but a minimum," meaning that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.'" (quoting Alleyne, 570 U.S. at 112)). That's because historically, the law defined a "'crime' as consisting of every fact which 'is in law essential to the punishment sought to be inflicted,' or the whole of the wrong 'to which the law affixes punishment.'" Alleyne, 570 U.S. at 109 (quoting 1 J. Bishop, Criminal Procedure 50 (2d ed. 1872)). So when a fact bumps up "the legally prescribed punishment" (meaning it "affixes" a new penalty to the defendant's conduct) it necessarily "constitutes an element of a separate, aggravated offense that must be found by the jury." Id. at 114–15; see also id. at 112 ("It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime."). In contrast, a judge may decide facts that merely "guide judicial discretion in selecting a punishment 'within limits fixed by law.'" Id. at 113 n.2 (quoting Williams v. New York, 337 U.S. 241, 246 (1949)). Viewed through Alleyne's lens, then, the mandatory Guidelines violated the Sixth Amendment (at least when no departure was available) because they changed the range of penalties "affixed" to the defendant's conduct, even if some other statute

- 28 -

listed a higher so-called "maximum" sentence for the crime of conviction. If they had "merely guide[d]" judicial discretion, instead of "fixing" its limits, Beckles, 137 S. Ct. at 892, they would not have broken the Apprendi rule, as Booker held they did. See Alleyne, 570 U.S. at 116–17; accord Booker, 543 U.S. at 234.

In our view, therefore, the precedent leaves no room for debate: when the pre-Booker Guidelines "bound [the judge] to impose a sentence within" a prescribed range, Booker, 543 U.S. at 234–35, as they ordinarily did, they necessarily "fixed the permissible range of sentences" (s)he could impose, Beckles, 137 S. Ct. at 892, whether they "fixed" a higher maximum *or* minimum sentence. See Davis, 139 S. Ct. at 2336 (striking down § 924(c)(3)(B), which enhanced the mandatory minimum — but not always the maximum — sentence required for certain defendants who used or carried a firearm in a "crime of violence" based on a similar residual clause as unconstitutionally vague).

It's easy to see why vague laws that "fix" sentences for Apprendi/Alleyne purposes violate the Due Process Clause. The Apprendi rule applied in Booker serves two main functions. First, fair notice: requiring the indictment to allege "every fact which is legally essential to the punishment to be inflicted . . . enable[s] [the defendant] to determine the species of offence with which he [is] charged in order that he may prepare his defence accordingly" and have "*no doubt as to the judgment which should be*

- 29 -

*given*, if the defendant be convicted."  Alleyne, 570 U.S. at 111 (quotations omitted); see also id. at 113–14 ("Defining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment").  But an indictment can't provide the notice the Constitution requires if the crime it charges is itself "so vague the defendant [can't] tell what he's alleged to have done and what sort of witnesses he might need to rebut that charge."  Sessions v. Dimaya, 138 S. Ct. 1204, 1227 (2018) (Gorsuch, J. concurring) (observing that the Sixth Amendment fair trial rights, like other constitutional protections, "presuppose and depend on the existence of reasonably clear laws").  The Apprendi rule also guards against "the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary convictions,'" by requiring the jury to find each fact "the law makes essential to his punishment." Booker, 543 U.S. at 232, 238 (first quoting The Federalist No. 83, at 499 (A. Hamilton) (C. Rossiter ed., 1961), then quoting Blakely v. Washington, 542 U.S. 296, 301 (2004)).  But if jurors can't tell what "facts" are "essential," and the judge can't educate them (without making up the law arbitrarily), then the jury can't do its job.  We could hardly expect twelve people to "confirm" "the truth of [an] accusation," id. at 239 (emphasis omitted)

(quoting Apprendi, 530 U.S. at 477), that even the judge can't decipher.

Without a doubt, then, when no departure applied, the vague residual clause that Shea claims raised his sentencing range (which told us an offense was a "crime of violence" if it posed a "'serious *potential* risk of physical injury to another'" in the abstract "*ordinary case*" of the crime, Frates, 896 F.3d at 95-96, 99 (emphases added) (quoting U.S.S.G. § 4B1.2(a)(2))) triggered the "twin concerns underlying vagueness doctrine — providing notice and preventing arbitrary enforcement." Beckles, 137 S. Ct. at 894. To see why, consider the reasons Beckles gave for why the advisory Guidelines didn't "implicate" those interests. First,

> [a]s to notice, even perfectly clear [advisory] Guidelines could not provide notice to a person who seeks to regulate his conduct so as to avoid particular penalties within the statutory range. That is because even if a person behaves so as to avoid an enhanced sentence under the career-offender guideline, the sentencing court retains discretion to impose the enhanced sentence. . . . "[T]he due process concerns that . . . require notice in a world of mandatory Guidelines no longer" apply . . . . All of the notice required is provided by the applicable statutory range, which establishes the permissible bounds of the court's sentencing discretion.

Id. (citations omitted). As to the second "twin concern," a law "invites arbitrary enforcement" if it "'leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case' . . . or

- 31 -

permits them to prescribe the sentences or sentencing range available."  Beckles, 137 S. Ct. at 894–95 (first quoting Giaccio v. Pennsylvania, 382 U.S. 399, 402–03 (1966), then citing Alleyne, 570 U.S. at 111-14).  Since the advisory Guidelines did not "fix the permissible range of [the] petitioner's sentence," "the District Court did not 'enforce' the [advisory] career-offender Guideline against" Beckles:  it just "relied on [the Guideline] for advice in exercising its discretion to choose a sentence within th[e] statutory limits."  Id. at 895.

In contrast, the pre-Booker Guidelines themselves routinely "establishe[d] the permissible bounds of the court's sentencing discretion."  Id. at 894.  When the Career Offender Guideline shot up the maximum permissible sentence (because there was no ground for an upward departure from the base guideline range), the judge could *not* have imposed the same range of penalties as without the enhancement.[10]  See Booker, 543 U.S. at 236–37.  Even when it only "[e]levat[ed] the low-end of [the] sentencing range" (as Shea claims it at least did in his case because there were no grounds for a downward departure), the guideline increased "the defendant's 'expected punishment . . .

---

[10] Here, for instance, giving Shea the same sentence without the Career Offender enhancement would have required a steep 165-month upward departure (the difference between the high-end of Shea's Guidelines range without the Career Offender enhancement and his actual sentence) if the enhancement hadn't applied.

as a result of the narrowed range[.]'" Alleyne, 570 U.S. at 113 (quoting Apprendi, 530 U.S. at 522 (Thomas, J., concurring)). So clearer standards would have warned a defendant (with constitutionally adequate certainty) "how to regulate his conduct so as to avoid" an enhanced mandatory range of punishments. See id. at 112-13 (explaining that laws defining the minimum and maximum sentences permissible historically "allowed those who violated the law to know, *ex ante*, the contours of the penalty that the legislature affixed to the crime" and "comport[ed] with the obvious truth that the floor of a mandatory range is as relevant to wrongdoers as the ceiling").[11]

That's not all. Even if the mandatory Career Offender Guideline somehow avoided "[t]he due process concerns that . . .

_____

[11] Although the government does not argue this point, we realize that as a practical matter, someone mulling committing a crime (viewing things "ex ante," as the Romans would say) might not know (or be realistically able to predict) whether he'd qualify for a departure if he followed through with the deed. Some grounds for departure — like the defendant's "substantial assistance" to the government, or extraordinary post-offense rehabilitation — depended on post-offense conduct. See Pepper, 562 U.S. at 503 n.16; United States v. Craven, 239 F.3d 91, 99 (1st Cir. 2001) ("It is only the occasional instance, where time and circumstances permit and the accused takes full advantage of both, that will produce rehabilitation so dramatic as to" warrant a downward departure (quoting United States v. Sklar*,* 920 F.2d 107, 115-16 (1st Cir. 1990)).); U.S.S.G. § 5K1.1. But as the Seventh Circuit recognized, statutory minima have similar escape hatches. See 18 U.S.C. § 3553(e), (f). Yet no one suggests these limited safety valves unlocked by post-offense efforts insulate statutes fixing mandatory minima, like the provisions struck in Johnson and Davis, from vagueness challenges. See Cross, 892 F.3d at 306 (concluding

require notice in a world of mandatory Guidelines" — the vague residual clause unquestionably "permits [judges] to prescribe the sentences or sentencing range available" "without any legally fixed standards." Beckles, 137 S. Ct. at 894–95. When the clause applied and no downward departure was available, "the prosecution [was] empowered, by invoking the [enhanced] mandatory minimum, to require the judge to impose a higher penalty than he might wish." Alleyne, 570 U.S. at 113 (quoting Apprendi, 530 U.S. at 522 (Thomas, J. concurring)). In such cases, the judge had to "enforce" the clause against the defendant. Beckles, 137 S. Ct. at 894–95; see United States v. Piper, 35 F.3d 611, 620 (1st Cir. 1994) ("The career offender regime, as crafted by Congress and the Sentencing Commission, is harsh, but the courts are obliged to enforce it according to its tenor. The district court did so here."). Yet the language gave judges no clear standards for deciding *when* the law bound them to enhance the permissible range

---

that those safety valves demonstrate that "some play in the joints is not enough to change the character of either statutory sentencing limitations or the pre-Booker guidelines from mandatory to advisory"). If the Career Offender residual clause were clear enough to signal when it would apply, prospective defendants could still behave so as to avoid conduct that would trigger its enhanced minimum and necessitate post-offense efforts (if available at all) to escape it. And in any event, by the time of sentencing — when a given defendant could ascertain that he did not qualify for a departure — the guideline undeniably fixed the sentences the judge could impose and invited arbitrary enforcement, to say nothing of the potential impediments the vague residual clause imposed on a defendant's ability to argue the enhancement did not apply.

— leaving that to "guesswork" and "invit[ing] arbitrary enforcement." Johnson, 576 U.S. at 597–602.

As such, the mandatory Guidelines' residual clause implicated both concerns driving the vagueness doctrine. Just as it did in Johnson, "[i]nvoking so shapeless a provision to condemn someone to prison" for almost 21 to 27 years "does not comport with the Constitution's guarantee of due process." Id. at 602.

### (iii) Departures

In its last effort to dodge the Johnson train, the government suggests that the fact that judges could depart in *some* cases gives grist for a reasonable claim that the mandatory Guidelines did not "fix" sentences like the ACCA did Johnson's. But the government does not argue (and it is unlikely, on this record, that it could) that Shea's case is one of those "specific, limited" cases in which the Guidelines permitted a departure. Booker, 543 U.S. at 234. Remember: under the SRA, departures were "unavailable" to *most* defendants. Booker, 543 U.S. at 232–35; see also Moore, 871 F.3d at 83 (noting that "[d]epartures . . . were limited in scope, and sentencing courts had little leeway in employing them," and citing six cases in which we held departures unauthorized); United States v. Pereira, 272 F.3d 76, 80 (1st Cir. 2001) ("[E]xisting caselaw define[d] the parameters for departure, outside of which a court [could ]not go without assuming the risk of acting beyond permissible limits.");

- 35 -

<u>Reid</u>, 252 F. Supp. 3d at 67 & n.2 (describing the mandatory Guidelines as a "rigidly imposed . . . straitjacket" under which we "stringently policed any sentences below the applicable Guideline range" and "district judges were compelled to impose harshly inflated prison terms on thousands of defendants"). So in cases where it applied, the mandatory residual clause almost always exposed the defendant to a higher maximum or minimum sentence — and most often to both, thereby raising "the penalty affixed to the crime," <u>Alleyne</u>, 570 U.S. at 112, and triggering the dual concerns animating the vagueness doctrine.

Shea asserts that his case was a typical one — that the Career Offender Guideline (rather than the force clause or an exercise of departure discretion) enhanced his sentence as "no downward departures were available" here. Specifically (he claims), the vague residual clause "fixed his minimum sentence at 262 months, thereby meaningfully altering his sentencing range. Thus, [his] sentencing judge could not have imposed between zero and 262 months of incarceration, even though the statute permitted such a sentence."[12] The record appears to support that claim.

---

[12] These quotes from Shea's reply memo clarify the position Shea took in his opening brief, which argued that under <u>Johnson</u>, "a provision that defines a crime *or fixes a sentence* by application of double indeterminacy [i.e., uncertainty about the "ordinary case" of the crime and the "potential risk" it posed] is unconstitutionally vague." Appellant's Br. at 13; <u>see also</u> <u>id.</u> at 8 (arguing that "the [mandatory] guideline residual clause and the

After a full presentence investigation, Shea's probation officer wrote that she knew of "no factors, mitigating or aggravating, which would justify a departure from the guideline range."  And as far as we can tell, no one else has ever identified any ground on which the judge could have departed.  On this record, then, the habeas court could plausibly agree with Shea and conclude (as the Supreme Court did in Booker, and as we did in several pre-Booker cases) that the Guideline foreclosed a departure and fixed the range of sentences the judge could have imposed.  See Booker, 543

---

ACCA residual clause . . . are textually the same and operate in the same way" because "they *fix a sentence* by application of double indeterminacy") (emphases added).  He argued that this rule "applie[d] to the mandatory career offender guideline residual clause."  Id. at 20.  But he did not address the exceptional cases in which the Guidelines were not (strictly speaking) "mandatory" because the defendant was eligible for a departure from the guideline range.  The government's response raised the departure issue first — in its (one-liner) responsive argument that courts' "ability to depart" in some cases distinguished the pre-Booker guideline regime from the ACCA.  In reply Shea explained (as we quote above) that the departure point was neither here nor there because, as in Booker (and as the PSR suggested), none was available to him — so his opening arguments about how the guidelines were "mandatory" and "fixed" sentences still applied with full force.  "While a reply brief is not the proper place to raise new arguments, it is proper for a court to look there for clarification," United States v. Bradstreet, 207 F.3d 76, 80 n.1 (1st Cir. 2000) (citation omitted), especially when (as here) that clarification responds to an argument raised for the first time in the appellee's brief, see Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("Often, counterpoints and rebuttal rejoinders arise or fit most naturally as a reply to an opposition argument that could not have reasonably been anticipated.  Neither our rules nor fairness require a robust application of waiver in such circumstances."); Holmes v. Spencer, 685 F.3d 51, 66 (1st Cir. 2012) (considering arguments raised for first time in reply to new argument advanced in appellee's brief).

U.S. at 235; United States v. Gendraw, 337 F.3d 70, 72-73 (1st Cir. 2003) (determining on appeal that the record "provide[d] no basis for departure on any ground" from the career-offender guideline range, such that "any decision by the district court granting a downward departure would have to be reversed"); United States v. Rushby, 936 F.2d 41, 43 (1st Cir. 1991) (concluding that if "the district court [had] departed on the basis of these facts [to which the appellant pointed], its decision could not have withstood legal challenge"). All of this bolsters Shea's contention that his petition invokes a rule Johnson dictates — because if no departure was available, then his sentence was "fixed" by the mandatory Career Offender Guideline, rather than the ranges described in his statutes of conviction.

As we've already explained, the possibility of departures in other, exceptional cases did not make the pre-Booker Guidelines any less mandatory in cases where no departure was available — cases like Freddie Booker's, Booker, 543 U.S. at 234, 256-57, and this one, as Shea describes it. So even if jurists might reasonably debate whether the rule announced in Johnson would apply to a defendant who, in addition to receiving a Career Offender designation under the Guidelines, was eligible for a departure, they could not reasonably disagree that Johnson applies when the Career Offender Guideline's residual clause fixed the permissible sentences, as Shea reasonably claims it did here. See

- 38 -

id. at 233-34 (expressly holding that at least in no-departure cases the Guidelines "have the force and effect of laws" and "require[] the selection of particular sentences").

As a result, we conclude that in a case where no departure was available, the residual clause in the mandatory Career Offender Guideline was, beyond reasonable debate, "a law regulating private conduct by fixing permissible sentences" that did *not* "provide notice[ ] and avoid[ ] arbitrary enforcement by clearly specifying the range of penalties available." Beckles, 137 U.S. at 895. As such, the rule recognized in Johnson dictates that in such cases, that residual clause violated due process. By asserting that the judge relied on that clause to enhance his mandatory sentence, Shea therefore "asserts" the "right . . . newly recognized" in Johnson. 28 U.S.C. § 2553(f)(3); see Chambers, 763 F. App'x at 524-27 (Moore, J., concurring); Brown, 868 F.3d at 309-10 (Gregory, C.J., dissenting); Carter, 422 F. Supp. 3d at 314-17; Hammond, 354 F. Supp. 3d 44-49; see also supra n.3 (citing cases that reached a similar conclusion).

## Wrap Up

The upshot is that both of Shea's claims are timely. The government does not (in this appeal) raise any other threshold bar to granting Shea relief. Rather, it advises that "[i]f this Court concludes that the defendant's § 2255 challenge to his career

offender designation is timely, the matter should be remanded to the district court to consider the merits."

We agree with the government. We ordinarily do not "consider the merits of an issue advanced by a habeas petitioner unless a COA first has been obtained *with respect to that issue*." Butterworth, 775 F.3d at 469 (quoting Peralta v. United States, 597 F.3d 74, 83 (1st Cir. 2010)). And in any event, "[w]e generally do not rule on questions — whether of fact or of law — until a district court has done so, a practice that enhances the quality of our decisions both by allowing us to consider the district court's analysis and by allowing the parties to hone their arguments before presenting them to us." Moore, 871 F.3d at 79 (quoting Evans-García v. United States, 744 F.3d 235, 237–38 (1st Cir. 2014)). In this case, the COA only teed up the timeliness issue, and the district court did not broach the merits.

What's more, to win on the merits of his Johnson-based challenge to his sentence, Shea will need to prove "by a preponderance of the evidence" that his "sentence rested on the residual clause" of the Career Offender Guideline. Dimott v. United States, 881 F.3d 232, 240–43 (1st Cir. 2018) (holding that "[t]o prove a Johnson [ ] claim, the movant must show that — more likely than not — it was the use of the residual clause that led to the sentencing court's enhancement of his sentence") (quoting Beeman v. United States, 871 F.3d 1215, 1221–22 (11th Cir. 2017))).

- 40 -

Shea argues that it must have. He now concedes that his prior armed robbery would still have qualified as a crime of violence, but he argues that the only other two candidates — Massachusetts A&B and ABPO — did not satisfy the surviving clauses of § 4B1.2(a)(2), at least under current precedent. Appellant's Br. at 21-23 (citing Rose, 896 F.3d at 109-10, and Faust, 853 F.3d at 50-51, 60, among other cases). In his papers below, he also cited cases suggesting that those crimes qualified as predicates only under the residual clause when he was sentenced. See Fernandez, 121 F.3d at 778-80 (explaining that Massachusetts ABPO qualified as a predicate under the residual clause at the time of Shea's sentencing); see also Dimott, 881 F.3d at 242 (noting that a petitioner may rely on precedent existing at the time of sentencing, among other things, to make the required showing). To rule for Shea on the merits, the district court will need to resolve this issue of fact (to the extent that it's disputed) on remand. See Pullman-Standard v. Swint, 456 U.S. 273, 291-92 (1982) (explaining that "[f]actfinding is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not . . . resolve[ ] in the first instance [a] factual dispute which ha[s] not been considered by the District Court" (quoting DeMarco v. United States, 415 U.S. 449, 450, n.* (1974)). Moreover, because the rule Johnson recognized applies only when the residual clause fixed a higher maximum or minimum

- 41 -

sentence (as was the case when the judge could not have departed), Shea will have to show that it more-likely-than-not did so in his case.[13]

Enough said then.  We <u>vacate</u> the judgment and <u>remand</u> for further proceedings consistent with this opinion.


**-Dissenting Opinion Follows-**

---

[13] We do not intend to foreclose the district court from considering any other bar to relief that the government has not forfeited.  <u>See, e.g.</u>, <u>Bartolomeo</u> v. <u>United States</u>, 960 F.3d 34, 48 (1st Cir. 2020) (holding that the district court did not clearly err in finding that any error in applying the mandatory residual clause did not prejudice the petitioner because the parties had agreed at sentencing to a 35-year above-guideline sentence).

**SELYA**, **Circuit Judge (dissenting).** Time-and-number limitations, generally applicable to certain collateral review proceedings, may sometimes be relaxed when a petitioner seeks to avail himself of a new rule of constitutional law announced by the Supreme Court and expressly made retroactive to cases previously decided. See Teague v. Lane, 489 U.S. 288, 310 (1989) ("[N]ew constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced . . . [u]nless they fall within an exception to the general rule."); see also Welch v. United States, 136 S. Ct. 1257, 1264 (2016) (discussing exceptions to general bar on retroactivity). But this principle does not provide free rein to the lower federal courts — the courts of appeals and the district courts — either to extend a rule into uncharted waters or to speculate about where a Supreme Court decision might eventually lead. My colleagues' decision crosses this line, staking out a position that the Court has yet to articulate. Because I cannot join this excursion into forbidden terrain, I write separately.

Let me set the stage. Here, Shea aspires to file his habeas petition out of time, and the applicable statute requires that the right he asserts must previously have been recognized by the Supreme Court. See 28 U.S.C. § 2255(f)(3). This right, he says, entails the invalidation of the residual clause of the pre-Booker career offender provision of the sentencing guidelines.

- 43 -

See United States v. Booker, 543 U.S. 220 (2005). Viewed in context, this proposition depends on the accuracy of Shea's assertion that this "new right" was previously recognized by the Supreme Court. Teague, 489 U.S. at 301 ("[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final."). To establish this necessary element of his case, Shea relies on the Supreme Court's decision in Johnson v. United States, 576 U.S. 591 (2015).

Shea's reliance is mislaid: despite my colleagues' heroic efforts in his behalf, such a link cannot be forged. To establish the requisite recognition, the Supreme Court would have had to either formally acknowledge or treat as valid the right asserted by Shea. United States v. Green, 898 F.3d 315, 318 (3rd Cir. 2018). It has done neither.

Johnson is surely a new right recognized by the Supreme Court because it required overruling several prior Supreme Court decisions upholding and applying the residual clause of the Armed Career Criminal Act (ACCA). See Welch, 136 S. Ct. at 1264 ("It is undisputed that Johnson announced a new rule."). This is only half of the battle, and the remaining question is whether the due process principles enunciated in Johnson perforce invalidate the residual clause of the career offender provision of the pre-Booker sentencing guidelines. If reasonable jurists can disagree about whether the rule stated in Johnson demands a finding that the

- 44 -

pre-Booker residual clause of the career offender guideline is unconstitutional, it necessarily follows that the new right upon which Shea relies was not announced in Johnson and has not yet been recognized by the Supreme Court. See Chaidez v. United States, 568 U.S. 342, 347 (2013) ("'[A] case announces a new rule if the result was not dictated by precedent' . . . [a]nd a holding is not so dictated . . . unless it would have been 'apparent to all reasonable jurists.'" (quoting Lambrix v. Singletary, 520 U.S. 518, 527–28 (1997))).

In my view, neither Johnson nor its progeny unequivocally answer this question. The Johnson Court overruled earlier decisions and held that the ACCA's residual clause was unconstitutional under due process principles. Johnson, 576 U.S. at 596-98. Later on, the Court determined that Johnson applied retroactively to cases on collateral review. See Welch, 136 S. Ct. at 1257. Even so, the Court subsequently upheld — as against a Johnson-inspired attack — a due process challenge to the residual clause of the career offender provision of the post-Booker sentencing guidelines. See Beckles v. United States, 137 S. Ct. 886 (2017). In reaching this result, the Court distinguished Johnson on the ground that the sentencing guidelines, made advisory by the Booker decision, did not "fix the permissible sentences for criminal offenses" because those guidelines merely informed the district court's exercise of sentencing discretion. Id. at 892

(emphasis omitted). As the Fifth Circuit aptly noted, "the Court's decisions up until this point evince a distinction between statutes that fix sentences and Guidelines that attempt to constrain the discretion of sentencing judges." United States v. London, 937 F.3d 502, 507 (5th Cir. 2019).

To be sure, the pre-Booker guidelines were thought to be mandatory, not advisory. See Booker, 543 U.S. at 234. Those guidelines cabined the range, within the statutory sentencing framework, in which the district court had to sentence the defendant; subject, however, to a modicum of flexibility based on the sentencing court's authority to depart. See id.

The short of it is that Johnson established a rule that due process principles apply to laws that fix sentences — a rule that the Supreme Court later made retroactive. For present purposes, though, a chasmal gap exists: there is no subsequent decision of the Court answering the question of whether the rule in Johnson extends to a guideline provision that does not have the effect of fixing a sentence by altering the statutory penalties. My colleagues do not succeed in bridging this gap, and I conclude that unless and until the Supreme Court answers the dispositive question favorably to him, Shea does not have a new right recognized by the Supreme Court sufficient to bear the weight of his petition.

This conclusion is hardly original, and I see no need to repastinate soil already well-plowed. All but one of the courts of appeals to have addressed this question have determined that Johnson does not constitute the newly recognized right that Shea needs to show. Nunez v. United States, 954 F.3d 465, 469 (2d Cir. 2020); London, 937 F.3d at 508; United States v. Blackstone, 903 F.3d 1020, 1028 (9th Cir. 2018); Russo v. United States, 902 F.3d 880, 883 (8th Cir. 2018); Green, 898 F.3d at 321; United States v. Greer, 881 F.3d 1241, 1248-49 (10th Cir. 2018); United States v. Brown, 868 F.3d 297, 304 (4th Cir. 2017); Raybon v. United States, 867 F.3d 625, 630-31 (6th Cir. 2017). But see Cross v. United States, 892 F.3d 288, 307 (7th Cir. 2018). These decisions thoughtfully address my colleagues' contentions both that the right recognized in Johnson extends beyond the ACCA and that the pre-Booker guidelines "fixed" sentences in violation of Johnson. See, e.g., London, 937 F.3d at 507 ("The pre-Booker Guidelines . . . only directed the discretion of the district judge within the statutory range . . . ."); Russo, 902 F.3d at 883 ("It is reasonably debatable whether Johnson's holding regarding the ACCA extends to the former mandatory guidelines."). I am of the opinion that, although the Court may in the future find the pre-Booker residual clause of the career offender guideline unconstitutionally vague, Johnson does not dictate such a result. Nunez, 954 F.3d at 470 (concluding that challenges to identical

residual clauses in other contexts were not "necessarily straightforward" and "further undermine [the] contention that Johnson in and of itself dictates the result of a vagueness challenge to the residual clause in the pre-Booker" guidelines); Blackstone, 903 F.3d at 1026 ("[Beckles] may permit an inference that the Court might reach a different result regarding a sentence imposed while the Guidelines were mandatory, . . . but that inference has not been recognized by the Court.")

To my mind, the proof of the pudding is in the case law. While precedents from other circuits are not binding upon us, the reasoned decisions of a large number of our sister circuits are, at the very least, entitled to respectful consideration. And where, as here, those decisions constitute a wide majority, rest on persuasive analysis, and tilt heavily in a uniformed direction, it blinks reality to suggest that jurists of reason could not decide the contested issue in that way.

I need go no further. The right that Shea is asserting is not a right that flows automatically from Johnson. Indeed, that right is not dictated by Johnson and has not yet been explicitly recognized by the Supreme Court. That so many judges have rejected Johnson's applicability to pre-Booker guidelines sounds the death knell for Shea's appeal. See Russo, 902 F.3d at 883; Greer, 898 F.3d at 1245. Given the tenebrous state of the law with respect to how (if at all) Johnson affects the career

- 48 -

offender provision of the pre-<u>Booker</u> sentencing guidelines, I would hold that Shea has not cleared the high bar set by section 2255(f)(3). Consequently, I would affirm the district court's dismissal of Shea's petition with respect to the guidelines issue.

I respectfully dissent as to that issue.[14]

---

[14] Inasmuch as the parties are in agreement as to the disposition of the unrelated issue involving 18 U.S.C. § 924(c), I need take no position as to that issue.